UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| RAFAEL ALMONTE,<br><br>               Plaintiff,<br><br>-against-<br><br>UNITED STATES OF AMERICA; SHEILA DIANE EASTER; MARTHA LICON VITALE; DOROTHY K. WILLIAMS; ROBERT GREENE; JULIE FABREGAS-SCHINDLER; HELEN MACGREGOR; and JEREMY STAUBER, in their individual capacities;<br><br>               Defendants. | No. 3:21-cv-959<br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiff Rafael Almonte, by and through his attorneys Silver Golub & Teitell LLP and Kaufman Lieb Lebowitz & Frick LLP, alleges as follows for his Complaint:

### PRELIMINARY STATEMENT

1.　　For at least five years in the custody of the Federal Bureau of Prisons ("BOP"), Rafael Almonte suffered from worsening and alarming symptoms caused by growing pressure on his spinal cord.

2.　　Mr. Almonte experienced pain and numbness in his upper extremities. The pain and numbness spread to his legs. It got so bad that he could barely walk. He had trouble standing upright and gripping objects in his hands.

3.　　He complained to doctors. He complained to nurses. He complained to health administrators. He complained to wardens. His lawyers complained to the court.

4.　　At every step, BOP consistently failed to get him the care he needed.

5.      BOP medical staff knew that Mr. Almonte needed an MRI of his spine no later than March 27, 2015.

6.      BOP did not get Mr. Almonte an MRI of his spine until *more than three years later*, on June 15, 2018.

7.      The findings of the MRI were extremely serious. Mr. Almonte had severe spinal stenosis with cord deformity and myelomalacia of the spinal cord. In other words, the building pressure on Mr. Almonte's spinal cord was causing permanent nerve damage that could eventually lead to paralysis or worse.

8.      On August 1, 2018, an orthopedist determined that Mr. Almonte was "in need of [an] *urgent* surgical consult" for spinal decompression surgery.

9.      BOP arranged a consultation with a surgeon three months later. Mr. Almonte agreed to surgery in early November 2018.

10.     Despite knowing that Mr. Almonte urgently needed spinal surgery, administrators, doctors, and nurses at Federal Correctional Institution-Danbury ("FCI-Danbury") entirely failed to ensure that Mr. Almonte received it.

11.     For approximately a year and a half, they did nothing. The surgery never happened.

12.     District Judge Underhill ultimately modified Mr. Almonte's sentence and ordered him released from prison to get him the medical care he needed.

13.     In doing so, Judge Underhill found: "The *BOP has been indifferent* to Almonte's condition."

14.     Within less than two months of his compassionate release from prison, Mr. Almonte underwent spinal decompression surgery.

15.     BOP's years of appalling neglect and deliberate indifference toward Mr. Almonte's serious medical needs caused him years of excruciating pain and left him with permanent limitations that will affect him for the rest of his life.

## JURISDICTION AND VENUE

16.     This action arises under the United States Constitution and the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.*

17.     The Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1346(b)(1).

18.     Venue lies in the District of Connecticut under 28 U.S.C. §§ 1391(b)(2) and 1402(b) because Plaintiff resides in this District and because a substantial part of the acts and omissions giving rise to this claim occurred in this District.

## PARTIES

19.     Plaintiff Rafael Almonte is a 48-year-old man who resides in Connecticut.

20.     Defendant Sheila Diane Easter is the warden of FCI-Danbury and has held that position since February 3, 2020.

21.     Defendant Martha Licon Vitale was Easter's predecessor as warden of FCI-Danbury and, on information and belief, served in that position for most of 2019.

22.     Defendant Dorothy K. Williams was Licon Vitale's predecessor as warden of FCI-Danbury and, on information and belief, served in that position from approximately 2016-2018.

23.     Defendant Robert Greene is a medical doctor who was and is a BOP medical provider assigned to FCI-Danbury, where he is the clinical director and the chair of the Utilization Review Committee (URC).[1]

---

[1]     Every BOP facility has a URC that is responsible for reviewing requests for outside medical care. The facility's Clinical Director chairs the URC, which also includes the facility's health services administrator and/or assistant health services administrator, its medical trip coordinator, and the health care providers directly involved in the cases under review. The URC makes recommendations on the

24.     Defendant Julie Fabregas-Schindler is a doctor of osteopathic medicine who was previously a BOP medical provider assigned to FCI-Danbury.

25.     Defendant Helen MacGregor is a nurse practitioner who was a BOP medical provider assigned to FCI-Danbury.

26.     Defendant Jeremy Stauber is a health services administrative assistant at FCI-Danbury who serves as the medical trip coordinator, among other responsibilities.

27.     Defendants Easter, Licon Vitale, Williams, Greene, Fabregas-Schindler, MacGregor, and Stauber are hereinafter referred to as the "Individual Defendants."

28.     Defendant United States of America is liable under the Federal Tort Claims Act for the injuries caused by the conduct of the Individual Defendants and its other employees and/or agents, including but not limited to Lirissia McCoy, Angela Dukate, and Federal Correctional Institution-Fairton ("FCI-Fairton") medical providers Dr. Ruben Morales and Mid-Level Practitioner Shirley Nati.[2]

29.     Mr. Almonte presented a claim to BOP on or about January 6, 2020, which was denied on January 12, 2021.

**JURY DEMAND**

30.     Plaintiff demands a jury trial on all claims triable by jury.

---

requests presented to it, but "the Clinical Director is the final authority for all URC decisions." U.S. Dep't of Justice, Fed. Bureau of Prisons, Program Statement No. 6031.04: Patient Care, June 3, 2014, https://www.bop.gov/policy/progstat/6031_004.pdf.

[2]     For most of Mr. Almonte's incarceration at FCI-Danbury, McCoy was the facility's health services administrator and Dukate was its assistant health services administrator. In or about early 2020, McCoy departed, and Dukate was promoted to health services administrator. McCoy and Dukate are, on information and belief, officers of the United States Public Health Service and are not named as defendants in this action due to absolute statutory immunity, *see* 42 U.S.C. § 233(a); *Hui v. Castaneda*, 559 U.S. 799 (2010).

# FACTS

## *Mr. Almonte Suffers a Serious Injury Before His Incarceration*

31.     Mr. Almonte was born in Danbury. After living with his grandmother in the Dominican Republic as a young child, he moved to New York City when he was 5 years old to join his parents.

32.     Beginning at age 9 or 10, Mr. Almonte lived in a housing project in Manhattan plagued by high levels of drug activity and violent crime.

33.     Mr. Almonte was robbed at gunpoint on Christmas Eve at age 13 and saw a man shot and killed outside his bedroom window when he was 15.

34.     Despite challenging circumstances, Mr. Almonte did well in school as a young man. He was an honor student in junior high school.

35.     At age 16, however, Mr. Almonte began drinking heavily and using marijuana and dropped out of high school.

36.     Mr. Almonte wanted to join the Marine Corps and passed the entrance exam but was denied admission because of his lack of a high school diploma.

37.     Mr. Almonte became a daily user of cocaine in his early 20s. He was convicted of various offenses from ages 20 to 28.

38.     While incarcerated during this period, he earned a high school equivalency diploma and completed drug treatment programs.

39.     After his release, he relapsed.

40.     Mr. Almonte moved to Danbury in 1998.

41.     There, he sold drugs to support himself and his habit while struggling with a serious addiction to cocaine.

42.     In 2004, federal agents investigating a Danbury drug trafficking operation identified Mr. Almonte on a wiretap arranging to purchase cocaine in quantities ranging from an eighth of an ounce to a half an ounce.

43.     In February 2005, Danbury police officers pulled over Mr. Almonte.

44.     Mr. Almonte drove away from the scene. In doing so, he drove his car into a concrete wall.

45.     Mr. Almonte sustained a serious neck injury fractured his first vertebra. He had fusion surgery in his cervical spine.

46.     Mr. Almonte was charged along with 21 other co-defendants in a conspiracy to distribute narcotics.

47.     Mr. Almonte pleaded guilty to two counts in 2006 and was sentenced to 262 months' imprisonment, or just under 22 years.

48.     The presentence report noted: "More than most defendants, Mr. Almonte struck this officer as being intelligent, articulate and poised. He has all the innate talent to become so much more than his criminal record suggests. . . . Being a relatively young man, he will have an opportunity to become the kind of leader and role model that he once envisioned himself to be, and redirect his negative history towards a future full of promise and productivity."

***BOP Medical Personnel Fail to Timely or Competently Treat or Diagnose Mr. Almonte for Worsening Spinal Issues***

49.     After his fusion surgery, Mr. Almonte experienced periodic neck pain and some numbness in his left thumb.

50.     No later than 2014, Mr. Almonte began complaining of progressively worsening tingling, shooting pain, and numbness in his left hand and arm.

6

51.     For instance, in March 2015, while incarcerated at FCI-Fairton in Fairton, New Jersey, Mr. Almonte reported in a request to staff: "I suffer from pain due to nerve damage from the result of an accident in a vehicle.  This pain is in my left arm/hand.  I take gabapentin [a nerve pain medication] 400mg, but this medication is not adequate as the pain persists relentlessly. I ended up taking about 2000 mg of Naproxen [Aleve] a day to manage that pain because for now I have no other recourse. Please help me."

52.     On March 27, 2015,[3] Dr. Ruben Morales, a BOP medical provider and the Clinical Director at FCI-Fairton, ordered an MRI of the spine for Mr. Almonte on an urgent basis.

53.     On April 14, 2015, Dr. Morales ordered an "urgent" orthopedic surgery consultation for Mr. Almonte. Dr. Morales noted: "MRI has been ordered but procedure is not scheduled yet."

54.     On April 17, 2015, the FCI-Fairton Utilization Review Committee met to consider the order for an MRI. On April 20, 2015, Dr. Morales—who, on information and belief, chaired the FCI-Fairton URC and retained ultimate authority for its decisions—decided that the MRI he previously ordered on an urgent basis would be deferred until Mr. Almonte was evaluated by an orthopedist.

55.     On May 19, 2015, Mr. Almonte was taken for an x-ray and an orthopedic visit. The orthopedist "strongly recommend[ed]" he see a spine subspecialist."

56.     In May and June 2015, the FCI-Fairton URC considered the requests for Mr. Almonte to get an MRI and see a spine specialist. Dr. Morales approved both, but only on a "routine" basis—despite his previous conclusion that an MRI was urgent.

---

[3]     Specific dates in these pleadings are accurate to the best of Mr. Almonte's knowledge, information, and belief upon review of relevant medical records prepared by other persons. Events alleged to have occurred on a specific date should be understood to have occurred on or about that date.

57.     Dr. Morales determined that Mr. Almonte should not see a spinal specialist until after having an MRI.

58.     Meanwhile, Mr. Almonte continued to complain repeatedly about his growing pain and his reliance on naproxen to manage it.

59.     Just by way of example, on June 29, 2015, he wrote in a sick call request: "I am in need of medical attention. The pain in my left arm/hand is relentless and it even rob[s] me of sleep as it persists all day and all night 24hrs a day. I do not take the meloxicam I have been prescribed because it absolutely does not work. It's taking 3,040mgs of Naproxen a day to provide a bit of relief. Please help."

60.     Mr. Almonte was first scheduled for an MRI on July 30, 2015.  The MRI did not proceed, however, because the technicians did not have enough information about an implant inserted into Mr. Almonte's leg during his surgery in 2005.

61.     After it became clear that the additional hardware was an inferior vena cava filter, MLP Shirley Nati cancelled the MRI request on or about September 15, 2015, based on an erroneous belief that Mr. Almonte could not have an MRI because of metal and titanium in his neck.

62.     Most orthopedic hardware does not interfere with and is safe to use in an MRI—as evidenced by the fact that Mr. Almonte safely underwent an MRI years later.

63.     On March 11, 2016, Mr. Almonte had a CT scan instead. The findings included moderate canal stenosis and severe foraminal stenosis at the C4-5 level of the spine.

64.     A CT scan is an inferior study under the circumstances that would not provide sufficient imaging of the soft tissue and discs for the purposes of a spinal surgeon.

65.     On June 2, 2016—more than a year after it was "strongly recommend[ed]"—Mr. Almonte was finally taken to see an outside spine specialist.

66.     The spine specialist determined that, "in order to further quantify his neuroforaminal stenosis, I do believe that he would benefit from [an] MRI scan." The spinal specialist was reluctant to recommend surgery in light of Mr. Almonte's increased risk of infection due to other preexisting health conditions.

67.     However, BOP medical staff at FCI-Fairton, including Dr. Morales and Nurse Practitioner Denise Rodriguez, told the spine specialist that Mr. Almonte was unsuitable for an MRI.

68.     Upon information and belief, Dr. Morales and NP Rodriguez relied on MLP Nati's incorrect assumption that Mr. Almonte could not safely have an MRI.

69.     Upon information and belief, no BOP medical staff checked Mr. Almonte's 2005 medical records or otherwise sought any information to determine whether the hardware was in fact safe for an MRI.

70.     Upon information and belief, no BOP medical staff sought to determine what specific information the outside MRI provider would need to proceed with an MRI.

71.     Mr. Almonte continued to complain of severe pain. For instance, on June 28, 2016, he wrote: "I have serious pain and numbness in my left hand and arm which lead me to consume upwards of 3000mgs of Naproxen daily. About a month ago the orthopedic surgeon ordered shots for me that would alleviate me of this affliction. Please, can I have those shots ASAP?"

72.     Nearly three months later, on October 12, 2016, Mr. Almonte underwent an epidural steroid injection into his neck in an effort to manage the pain.

73.     The injection provided moderate relief. While two more injections were scheduled, Mr. Almonte decided in early 2017 to discontinue the injections to enable his transfer to FCI-Danbury. The transfer was important to him to be closer to his family, among other reasons.

***FCI-Danbury Delays a Year in Getting Mr. Almonte an MRI and a Diagnosis***

74.     Mr. Almonte was transferred temporarily to the Metropolitan Detention Center in Brooklyn, New York on or about March 21, 2017, and then transferred to FCI-Danbury on or about May 9, 2017.

75.     On July 7, 2017, a neurologist recommended that Mr. Almonte see an orthopedist.

76.     Nurse Practioner Helen MacGregor ordered an orthopedic consultation for Mr. Almonte on July 20, 2017.

77.     Mr. Almonte was not promptly taken to see an orthopedist. Instead, for his entire first year at FCI-Danbury, he rotated through a set of pain medications that failed to effectively address his increasingly debilitating pain.

78.     For instance, on January 6, 2018, NP MacGregor wrote: "P[atient] has trialed max dosage of both Pamelor and Elavil, and duloxetine. P[atient] today reports pain that is radiating bilaterally down arms . . . . Would like to consider alternate medication."

79.     NP MacGregor ordered an MRI for Mr. Almonte that same day, without any apparent hesitation regarding hardware or implants.

80.     In sick calls with Clinical Director Dr. Robert Greene from March through May of 2018, Mr. Almonte repeatedly requested increases in medication and expressed concern that he had not yet been seen by an orthopedist.

81.     On information and belief, Dr. Greene had actual knowledge of the orders for an orthopedic consultation and an MRI for Mr. Almonte in his capacity as the chair of the URC for FCI-Danbury.

82.     In that capacity, Dr. Greene had the ultimate authority to approve the orthopedic consultation and MRI and determine how quickly they should occur.

83.     On information and belief, neither Dr. Greene nor NP MacGregor took adequate measures to ensure that Mr. Almonte promptly received an MRI.

***Mr. Almonte Finally Gets an MRI and Sees an Orthopedist, Which Results in a Serious and Urgent Diagnosis***

84.     On June 15, 2018—more than *three years* after BOP medical staff had first ordered it—Mr. Almonte finally got an MRI.

85.     The results were disturbing and extremely serious.

86.     The provider reported this finding, among others, to Dr. Greene: "**Severe central spinal stenosis** at C4-C5 with cord deformity and findings of chronic **myelomalacia** of the spinal cord."

87.     The provider also reported to Dr. Greene that Mr. Almonte had "[m]oderate spinal stenosis at C5-C6" and "[m]ultiple degenerative changes with varying degrees of central stenosis and neuroforaminal narrowing . . . , including severe foraminal narrowing on the left at C5-C6 and on the right at C6-C7 with suspected foraminal nerve root impingement."

88.     In layman's terms, the bones in Mr. Almonte's spine were severely compressed in the area of his neck. That compression was putting extreme pressure on the spinal cord itself, causing it to become softened, weakened, and deformed and leading to nerve damage and impaired functioning.

89.     Myelomalacia is generally permanent and is not reversible or curable.

90.     Before his diagnosis, Mr. Almonte had been exhibiting all the well-known classic signs of myelomalacia: pain, numbness, weakness, and loss of coordination.

91.     It is widely known in the medical profession that the failure to promptly address severe spinal compression risks the possibility of permanent mobility impairment, paralysis, or even death.

92.     On August 1, 2018, an outside orthopedist, Dr. Daniel Southern, examined Mr. Almonte.

93.     Dr. Southern noted that Mr. Almonte had "8 out of 10 intensity pain in the left upper extremity associated with weakness and numbness," "chronic left back pain radiating through the buttock," "difficulty tandem walking" (meaning walking heel-to-toe), and "clinical weakness in the left triceps."

94.     Mr. Almonte reported that he felt unsteady on his feet and that his gait had changed.

95.     Dr. Southern concluded: "This is a patient with cord signal changes and evidence of all long tract involvement who is clinically developing signs of myelopathy. **The patient is in need of urgent surgical consult for decompression at the C4-5 level.** He will be referred for this."

96.     On October 1, 2018, NP MacGregor ordered that Mr. Almonte be scheduled for spinal decompression surgery on an "urgent" basis. "Please conduct c-spine decompression . . . . Please schedule within 14 days," she wrote.

97.     On October 10, 2018, Dr. Greene wrote in the medical records: "Previous MRI . . . demonstrated severe central spinal stenosis @C4-5 with cord deformity and findings of chronic myelomalacia of the spinal cord."

98.     On November 1, 2018, Mr. Almonte had a presurgery consultation with an outside orthopedist, who told him he would need a large reconstruction of the cervical spine to address the problems he had been experiencing.

99.    Mr. Almonte elected surgery and expressed his decision to his BOP providers at the earliest opportunity.

100.    On November 14, 2018, NP MacGregor ordered a post-surgical follow-up consultation with Dr. Southern, thereby demonstrating the understanding of FCI-Danbury medical staff that Mr. Almonte would have spinal surgery in the near future.

***FCI-Danbury Medical Providers and Administrators Consistently Fail to Provide Mr. Almonte with the Treatment They Know He Urgently Needs***

101.    For approximately a year and a half, despite their actual knowledge that Mr. Almonte urgently needed spinal decompression surgery, medical providers and administrators at FCI-Danbury took no action to ensure that Mr. Almonte received it.

102.    On information and belief, all members of the FCI-Danbury URC had actual knowledge of Mr. Almonte's need for surgery and consent to surgery shortly after NP MacGregor ordered the post-surgical follow-up.

103.    None took action to ensure that Mr. Almonte had timely surgery.

104.    Throughout the period from late 2018 until his eventual release from FCI-Danbury, Mr. Almonte repeatedly made verbal inquiries and complaints about the scheduling of his surgery to FCI-Danbury administrative staff.

105.    It was the regular practice of FCI-Danbury administrators, including the warden and the health services administrator, to make themselves available to speak to inmates in the mess hall at lunchtime.

106.    While Dorothy K. Williams served as warden, Mr. Almonte approached her in the mess hall on a handful of occasions to complaint that he was not receiving timely or adequate treatment for his debilitating back pain.

107.    On information and belief, Warden Williams took no measures to ensure that FCI-Danbury medical staff arranged for a timely MRI or for timely surgery.

108.    After Martha Licon Vitale assumed leadership of FCI-Danbury, Mr. Almonte approached her in the mess hall. Warden Licon Vitale, who had previously worked at FCI-Fairton, recognized Mr. Almonte from FCI-Fairton and greeted him accordingly.

109.    Mr. Almonte said, in sum and substance, that he had been told by an orthopedist that he urgently needed spinal surgery and had not received it.

110.    Warden Licon Vitale told Mr. Almonte, in sum and substance, that he should address the issue with the medical staff.

111.    Mr. Almonte explained, in sum and substance, that he had repeatedly done so but that no apparent progress had been made.

112.    Mr. Almonte had other oral conversations about the surgery in the mess hall with Warden Licon Vitale during her tenure.

113.    On information and belief, Warden Licon Vitale took no measures to ensure that FCI-Danbury medical staff arranged for timely surgery.

114.    Mr. Almonte had repeated oral follow-up conversations with health services administrator McCoy and assistant health services administrator Dukate to follow up about when he would receive the surgery.

115.    McCoy and Dukate repeatedly told him that the surgery was scheduled and that he should be patient, even though the surgery was evidently not scheduled.

116.    Mr. Almonte also spoke with medical trip coordinator Stauber on two or three occasions to follow up about when the surgery would be scheduled.

117.    Stauber also told him that the surgery was scheduled and that he should be patient. Evidently, however, it was not.

118.    On February 15, 2019, Mr. Almonte had another MRI of his lumbar (lower) spine, which showed additional severe spinal stenosis at the L4-L5 levels.

119.    On April 17, 2019, Mr. Almonte had a visit with BOP medical provider Dr. Julie Fabregas-Schindler, to whom he reported that he was experiencing pain in his lower back and radiating down his left leg, aggravated by walking and standing, which he rated as a 10 out of 10 in severity.

120.    On May 22, 2019, Mr. Almonte told Dr. Fabregas-Schindler, in sum and substance, "I feel like I am going to fall over when I walk, especially in the morning."

121.    On June 10, 2019, Dr. Fabregas-Schindler ordered an urgent neurosurgery consultation for Mr. Almonte for both his cervical and lumbar stenosis.

122.    The same day, however, Dr. Fabregas-Schindler cancelled the referral for reasons not documented in the medical records.

123.    On October 15, 2019, Mr. Almonte saw Dr. Fabregas-Schindler again and complained of inability to perform basic tasks because of his neck pain.

124.    Dr. Fabregas-Schindler wrote that Mr. Almonte "was supposed to have cervical surgery, but the referral was cancelled. It is not clear as to why he never saw specialist."

125.    On November 1, 2019, Dr. Fabregas-Schindler generated yet another urgent neurosurgery referral for Mr. Almonte.

126.    Mr. Almonte's pain continued to escalate and to become increasingly debilitating. He continued complaining orally to administrators and medical personnel.

127.    Meanwhile, Mr. Almonte also filed a motion for compassionate release in the District Court before Judge Underhill.

128.    On January 6, 2020, Mr. Almonte wrote in a sick call request: "I am suffering from pain and severe numbness 24hrs a day in both of my upper extremities and . . . both . . . lower extremities as well. The pain and numbness in back and legs make it difficult to walk and even to stand. I fear for my overall well-being as my condition continues to deteriorate at a disturbing rate. I require surgical decompression surgery urgently."

129.    On January 7, 2019, Mr. Almonte had another sick call with Dr. Greene in which Dr. Greene notes that "decompression at the C4-5 level is needed- per recommendation of orthopedics."  Again, the surgery was not scheduled.

130.    On January 16, 2020, Mr. Almonte filed an administrative grievance requesting that his surgery be expedited.

131.    Warden Easter denied the grievance on February 13, 2020 on the basis that Mr. Almonte "ha[d] an approved and scheduled appointment with the Neurosurgical Associates of Southwest Connecticut in the near future to address decompression surgery."

132.    No such appointment occurred.

133.    On March 23, 2020, in the context of Mr. Almonte's motion for compassionate release, the Government represented to Judge Underhill that Mr. Almonte had been scheduled for an appointment with a spinal surgeon on March 30, 2020.

134.    However, on March 19, 2020, staff from FCI-Danbury had in fact cancelled the appointment without rescheduling it.

135.     The Government again represented to Judge Underhill on March 26, 2020, that, due to COVID-19-related concerns, Mr. Almonte would have a telephonic appointment with the spinal surgeon on March 30, 2020.

136.     The appointment did not occur because staff at FCI-Danbury failed to provide the surgeon's office with the necessary information. On information and belief, it was the responsibility of medical trip coordinator Stauber to provide the surgeon with that information.

137.     After FCI-Danbury staff failed to properly arrange the March 30 phone appointment, none of the Defendants took any action to schedule a new appointment in short order.

138.     To the contrary, Dr. Fabregas-Schindler told Mr. Almonte that she did not know when he could see the surgeon and that would likely not be able to proceed directly to surgery after the consultation anyway.

139.     Instead, she told Mr. Almonte he would likely need another MRI, which might take months for FCI-Danbury staff to arrange.

***Mr. Almonte Is Granted Compassionate Release and Obtains Surgery***

140.     On April 9, 2020, Judge Underhill granted Mr. Almonte's motion for a sentence reduction for "extraordinary and compelling reasons" under 28 U.S.C. § 3582(c)(1)(A)(i), reduced his sentence to time served, and ordered him released from prison to his previously imposed term of supervised release.

141.     The principal basis for the sentence reduction was Defendants' failure to treat Mr. Almonte's serious and worsening physical condition.

142.     In granting compassionate release, Judge Underhill found:

> Almonte suffers from a serious physical condition that has begun to substantially diminish his ability to care for himself and from which—given the BOP's failure to address Almonte's condition— Almonte will not improve or recover under current circumstances.

> ***The BOP has been indifferent to Almonte's condition*** under
> normal circumstances [before COVID-19], and there is no reason
> to think that will change. In fact the BOP's indifference will almost
> certainly get worse . . . .[4]

143.     Judge Underhill also relied upon Mr. Almonte's "total" rehabilitation in granting compassionate release.

144.     As Judge Underhill noted, Mr. Almonte maintained close family relationships, pursued educational opportunities, and worked consistently during his incarceration. He incurred only a single minor disciplinary infraction in 15 years of imprisonment.

145.     Upon his release, Mr. Almonte promptly arranged for health insurance coverage with the assistance of counsel.

146.     Mr. Almonte had a surgical consultation with Dr. Luis Kolb at Yale-New Haven Hospital by videoconference on May 6, 2020.

147.     Dr. Kolb noted: "Worsening severe myelopathy in the setting of prior O-C Fusion, will need surgical decompression. **Given rapid decline will plan to expediate**."

148.     Less than a month later, on June 6, 2020, Dr. Kolb performed spinal decompression surgery at Yale-New Haven Hospital.

***BOP's Unconscionable Delays in Providing Treatment Cause Mr. Almonte Significant Pain and Permanent Injury***

149.     Since his release from prison, Mr. Almonte has been spending time with his family and complying with the terms of his supervised release.

150.     After recovering from surgery, Mr. Almonte has worked regularly as an Uber driver. He still finds it less painful to sit down than to stand up.

---

[4]     Order at 14, ECF No. 1521, *United States v. Almontes*, No. 3:05-CR-58 (SRU) (D. Conn. Apr. 9, 2020) (emphasis added) (citations omitted). Mr. Almonte was erroneously indicted as "Rafael Almontes," so many of the records associated with his criminal case and his incarceration bear that incorrect name.

151.    In addition to the excruciating pain he lived with on a day-to-day basis as his spinal cord was being compressed and weakened, BOP's failure to timely and competently diagnosis and treat Mr. Almonte has left him with lasting impairments.

152.    Mr. Almonte continues to experience weakness, difficulty balancing, and difficulty walking.

153.    He has experienced erectile dysfunction as a result of the nerve damage he sustained.

154.    He is unable to exercise and perform physical labor in the same way he once was.

155.    His life will never be the same as it would have been if BOP had provided him with appropriate medical treatment instead of ignoring his serious needs.

**CAUSES OF ACTION**
**FIRST CLAIM**
**FEDERAL TORT CLAIMS ACT – MEDICAL MALPRACTICE**
**(Against the United States of America)**

156.    Plaintiff realleges the preceding paragraphs as if set forth here.

157.    At all relevant times, Defendant United States of America, by and through its agents and employees, including medical professionals employed by the BOP and/or USPHS, had a non-delegable duty to provide Plaintiff with reasonable medical care while in the care, custody, and control of the BOP.

158.    At all relevant times, Defendant United States of America, by and through its agents and/or employees, including medical professionals employed by the BOP and/or USPHS, had a duty to render medical care to Plaintiff in a skillful and careful manner in accordance with the accepted professional standards of medical care and treatment rendered by reasonably prudent health care providers in the community.

159.    Defendant United States of America, by and through its staff, physicians, nurses, health administrators, and employees, acting within the scope of their employment and/or agency, breached the duty of care owed to Plaintiff and failed to provide care in accordance with prevailing professional standards, including by:

        a.      Failing to promptly obtain an MRI for Plaintiff and/or arrange for other suitable diagnostic imaging and/or testing;

        b.      Failing to ascertain that Plaintiff's orthopedic hardware and/or filter did not prevent him from safely undergoing an MRI;

        c.      Failing to promptly and correctly diagnose Plaintiff with, among other things, spinal stenosis, cord deformity, myelopathy, and/or myelomalacia;

        d.      Failing to promptly explore treatment options for Plaintiff's condition;

        e.      Once surgery had been recommended, failing to promptly arrange the surgery and ensure that it occurred.

160.    At the time of the relevant acts and/or omissions, the relevant employees and/or agents of the United States of America were acting within the scope of their employment with the BOP and/or USPHS.

161.    As a proximate result of the conduct of employees and/or agents of Defendant United States of America, Plaintiff suffered the damages hereinbefore alleged.

**SECOND CLAIM**
**FEDERAL TORT CLAIMS ACT – NEGLIGENCE**
**(Against the United States of America)**

162.    Plaintiff realleges the preceding paragraphs as if set forth here.

163.    At all relevant times, Defendant United States of America, by and through its agents and employees, including medical administrative staff employed by the BOP and/or USPHS, had a duty of reasonable care toward Plaintiff.

164.    Defendant United States of America, by and through its staff, physicians, nurses, health administrators, and employees, acting within the scope of their employment and/or agency, breached the duty of care owed to Plaintiff, including by:

    a.    Failing to promptly obtain an MRI for Plaintiff and/or arrange for other suitable diagnostic imaging and/or testing;

    b.    Failing to ascertain that Plaintiff's orthopedic hardware and/or filter did not prevent him from safely undergoing an MRI;

    c.    Failing to promptly and correctly diagnose Plaintiff with, among other things, spinal stenosis, cord deformity, myelopathy, and/or myelomalacia;

    d.    Failing to promptly explore treatment options for Plaintiff's condition;

    e.    Once surgery had been recommended, failing to promptly arrange the surgery and ensure that it occurred.

165.    At the time of the relevant acts and/or omissions, the relevant employees and/or agents of the United States of America were acting within the scope of their employment with the BOP and/or USPHS.

166.    As a proximate result of the conduct of employees and/or agents of Defendant United States of America, Plaintiff suffered the damages hereinbefore alleged.

## THIRD CLAIM
## EIGHTH AMENDMENT – *BIVENS*
### (Against the Individual Defendants)

167.    Plaintiff realleges the preceding paragraphs as if set forth here.

168.    Throughout his incarceration at FCI-Danbury, Plaintiff had a serious degenerative spinal condition that constituted a serious medical need.

169.    The Individual Defendants knew or should have known that failure to provide Plaintiff with a timely MRI and/or timely consultation with an orthopedist and/or spinal surgeon would pose an unacceptable risk of serious physical harm.

170.    Once an orthopedist determined that Plaintiff was in urgent need of spinal decompression surgery, the Individual Defendants knew or should have known that failing to provide Plaintiff with the surgery would pose an unacceptable risk of serious physical harm.

171.    Despite their knowledge, the Individual Defendants failed to act to ensure that Plaintiff received timely medical treatment, including an MRI, consultation, and surgery.

172.    The Individual Defendants were deliberately indifferent to Plaintiff's serious medical need.

173.    As a proximate result of the Individual Defendants' conduct, Plaintiff suffered the damages hereinbefore alleged.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court grant the following relief:

A.      Compensatory damages in an amount to be determined at trial;

B.      Punitive damages against the Individual Defendants in an amount to be determined

at trial;

C.      An award of reasonable costs and attorneys' fees to the fullest extent permitted by

applicable law;

D.      Pre- and post-judgment interest to the fullest extent permitted by law; and

E.      Any additional relief the Court deems just and proper.

## CERTIFICATE

I hereby certify that a reasonable inquiry has been made, as permitted by the circumstances, and this inquiry has given rise to a good faith belief on my part that grounds exist for an action against each named defendant.  Pursuant to Connecticut General Statutes § 52-190a, a copy of a redacted written and signed opinion of a similar health care provider, as defined in Connecticut General Statutes § 52-184c, is attached to this certificate as Exhibit A.


*/s/ Sean K. McElligott*
SEAN K. MCELLIGOTT, ESQ.

Dated:          July 12, 2021

SILVER GOLUB & TEITELL LLP

_____ /s/ Sean K. McElligott_

Sean K. McElligott
184 Atlantic Street
Stamford, Connecticut 06901
(203) 325-4491
smcelligott@sgtlaw.com

KAUFMAN LIEB LEBOWITZ
& FRICK LLP

Douglas E. Lieb*
10 E. 40th Street, Suite 3307
New York, New York 10016
(212) 660-2332
dlieb@kllf-law.com

* Application for admission to
  D. Conn. forthcoming

*Counsel for Plaintiff*

# EXHIBIT A

Dear Mr. McElligott,

Thank you for asking me to review the matter of Raphael Almonte. As you are aware, I am board certified in Internal Medicine. I earned my medical degree at the University of Massachusetts in Worcester followed by residency and fellowship in Internal Medicine at Brown University. I have actively practiced as an internal medicine physician in the correctional setting for the past 20 years. In addition, I am currently an Associate Clinical Professor of Family & Community Health at the University of Massachusetts. I am a fellow of the American College of Correctional Physicians (FACCP) and I am a Certified Correctional Healthcare Professional Physician (CCHP-P) through the National Commission for Correctional Healthcare (NCCHC). I also currently serve on the Board of Directors of the American College of Correctional Physicians as the Committee Chair and Editor-in-Chief of CorrDocs, the College's newsletter. I have been published in correctional medicine textbooks (Oxford Textbook of Correctional Psychiatry, Handbook of STD's in Corrections). For seven years, I served as the Medical Director of Baystate Correctional Center and subsequently served as the Medical Director of MCI-Norfolk. For the past seven years, I have been the Utilization Review Physician Advisor by which I determine the medical necessity for consultation and off-site care in addition to still seeing inmate patients a couple times a week. In connection with my review, I have been provided with the following materials:

- Ortho Connecticut Danbury Orthopedics Records and Radiology Images: 8/11/2018– 5/18/19
- Premier Orthopedic Associates Records
- Yale New Haven Hospital Records:
  1. 3/3/05 – 3/14/05
  2. 4/23/20
  3. 5/6/20
  4. 6/2/20 – 6/8/20
  5. 7/29/20
- Bureau of Prisons Records: 1/28/2013 – 1/28/2020 (containing outside treater records beginning in 2005)
- US DOJ Letter re: Foia: 1/31/2020
- Warden Easter Letter: 2/10/20
- Full medical chronology prepared by nurse consultant on 4/30/2021
- Danbury FCI utilization review committee regulations

This case involves several different correctional providers working as a team, which is common in this healthcare setting. I am familiar with the operations of a treatment team from my extensive experience treating patients in the correctional context. During the relevant time period, Dr. Robert Greene was a medical doctor and the clinical director and the chair of the Utilization Review Committee at FCI-Danbury. I am familiar with the standard of care applicable to a medical

doctor functioning as a clinical director and member of a utilization review committee in the correctional setting.   During the relevant time period, Dr. Julie Fabregas-Schindler was a medical doctor providing primary care services to prisoners at FCI-Danbury. I am familiar with the standard of care applicable to a medical doctor providing primary care services in the correctional setting.  During the relevant time period, Helen MacGregor was a nurse practitioner providing medical services to prisoners at FCI-Danbury. I am familiar with the standard of care applicable to a nurse practitioner providing medical services in the correctional setting. During the relevant time period, Shirley Nati was a health care provider functioning as a nurse practitioner providing medical services to prisoners at FCI-Fairton.  I am familiar with the standard of care applicable to individuals functioning as nurse practitioners and providing medical services in the correctional setting.  During the relevant time period, Jeremy Stauber was a health services administrative assistant who served as the medical trip coordinator at FCI-Danbury. I am familiar with the standard of care applicable to a health services administrative assistant serving as a medical trip coordinator.

I am licensed as a medical doctor in Massachusetts and my familiarity with the above-noted standards of care is from my training and experience occurring as a result of my active involvement in the practice and teaching of medicine within the five-year period before the incidents giving rise to this claim.  My familiarity with these standards of care is as of the date of the treatment indicated below and in the United States.

In 2005, Mr. Almonte underwent spinal fusion surgery on his neck.  Patients who have undergone spinal fusion surgery need to be monitored for signs of spinal column instability and degenerative changes that can negatively impact the spinal cord and exiting nerves even if the surgery occurred years before.  Starting in around 2014, Mr. Almonte began complaining of progressively worsening tingling, shooting pain, and numbness in his left hand and arm.

On March 27, 2015, Dr. Ruben Morales, a BOP medical provider and the Clinical Director at FCI-Fairton, ordered an MRI of the spine for Mr. Almonte on an urgent basis.  On April 14, 2015, Dr. Morales ordered an "urgent" orthopedic surgery consultation for Mr. Almonte. Dr. Morales noted: "MRI has been ordered but procedure is not scheduled yet." On April 17, 2015, the FCI-Fairton Utilization Review Committee met to consider the order for an MRI. The Utilization Review Committee decided that the MRI would be deferred until Mr. Almonte was evaluated by an orthopedist.

On May 19, 2015, Mr. Almonte was taken for an x-ray and an orthopedic visit. The orthopedist "strongly recommend[ed]" he see a spine subspecialist."  In May and June 2015, the FCI-Fairton URC approved the requests for Mr. Almonte to get an MRI and see a spine specialist. Mr. Almonte was first scheduled for an MRI on July 30, 2015.  The MRI did not proceed, however, because although the radiology department was aware of the hardware in the neck, Mr Almonte disclosed at that time possible additional hardware in his leg. After the additional hardware was found to be an implanted inferior vena cava (IVC) filter, the MRI request was cancelled by Shirley Nati who believed incorrectly that the patient could not have an MRI since he had metal and

titanium in his neck.  Instead, Mr. Almonte was scheduled for a CT scan on March 11, 2016, six months after Ms. Nati's alternative recommendation. Although the CT scan did show significant abnormalities, the imaging cannot show the soft tissue and discs as well thus is an inferior study in these circumstances as a spine surgeon would need to know that level of Mr. Almonte's anatomy.  A CT scan won't image the spinal cord to the level of detail needed to determine if nerve injury was occurring, which was the concern of the orthopedist. An MRI is the proper imaging study for that concern, though it should not be performed on patients with certain types of metal in their bodies, Mr. Almonte did not have those metallic bodies that would put him at risk for injury.

Ms. Nati's decision to cancel the MRI delayed diagnosis and recognition of Mr. Almonte's serious spinal cord condition unnecessarily by several months.  Ms. Nati's action in cancelling the MRI fell below the standard of care due to unfamiliarity with what hardware are contraindications for MRI imaging and which are not.  Mr. Almonte was referred originally by the BOP physician Dr. Morales in July of 2015; the decision by Ms. Nati occurred a month and a half later in September of 2015 and the CT scan of the neck eventually was performed March of 2016, eight months after the initial referral and a year after Mr. Almonte was seen for worsening of his pain and paresthesias. It appears he should have in fact had that MRI performed and would have been able to do so safely as validated by the several MRIs he underwent subsequently.  It does not appear that any BOP medical staff checked Mr. Almonte's 2005 medical records or otherwise sought any information to determine whether the hardware was in fact safe for an MRI, relying solely on Ms. Nati's incorrect assumption.

Mr. Almonte was transferred to FCI-Danbury on or about May 9, 2017.  On July 7, 2017, a neurologist recommended that Mr. Almonte see an orthopedist.  Nurse Practioner Helen MacGregor ordered an orthopedic consultation and MRI for Mr. Almonte on July 20, 2017.  Mr. Almonte was not promptly taken to see an orthopedist.  In sick calls with Clinical Director Dr. Robert Greene from March through May of 2018, Mr. Almonte repeatedly requested increases in medication and expressed concern that he had not yet been seen by an orthopedist.  Dr. Greene appears to have had actual knowledge of the orders for an orthopedic consultation and an MRI for Mr. Almonte in his capacity as the chair of the FCI-Danbury URC.  Neither Dr. Greene nor NP MacGregor took adequate measures to ensure that Mr. Almonte promptly received an MRI in a timely fashion despite multiple opportunities.  This lack of action fell below the standard of care for both practitioners.

On June 15, 2018—more than three years after BOP medical staff had first ordered it— Mr. Almonte finally got an MRI.  The radiology provider reported this finding, among others, to Dr. Greene: "Severe central spinal stenosis at C4-C5 with cord deformity and findings of chronic myelomalacia of the spinal cord."  The provider also reported to Dr. Greene that Mr. Almonte had "[m]oderate spinal stenosis at C5-C6" and "[m]ultiple degenerative changes with varying degrees of central stenosis and neuroforaminal narrowing . . . , including severe foraminal narrowing on the left at C5-C6 and on the right at C6-C7 with suspected foraminal nerve root impingement."

Before his diagnosis, Mr. Almonte had been exhibiting classic signs of myelomalacia caused by spinal cord compression: pain, numbness, weakness, and loss of coordination.  It is widely known in the medical profession that the failure to promptly address severe spinal compression risks the possibility of permanent mobility impairment, paralysis, or even death.

On August 1, 2018, an outside orthopedist, Dr. Daniel Southern, examined Mr. Almonte. Dr. Southern noted that Mr. Almonte had "8 out of 10 intensity pain in the left upper extremity associated with weakness and numbness," "chronic left back pain radiating through the buttock," "difficulty tandem walking" (meaning walking heel-to-toe), and "clinical weakness in the left triceps." Mr. Almonte reported that he felt unsteady on his feet and that his gait had changed.  Dr. Southern concluded: "This is a patient with cord signal changes and evidence of all long tract involvement who is clinically developing signs of myelopathy. The patient is in need of urgent surgical consult for decompression at the C4-5 level. He will be referred for this."

On October 1, 2018, NP MacGregor ordered that Mr. Almonte be scheduled for spinal decompression surgery on an "urgent" basis. "Please conduct c-spine decompression . . . . Please schedule within 14 days," she wrote.  On October 10, 2018, Dr. Greene wrote in the medical records: "Previous MRI . . . demonstrated severe central spinal stenosis @C4-5 with cord deformity and findings of chronic myelomalacia of the spinal cord." On November 1, 2018, Mr. Almonte had a pre-surgical consultation with an outside orthopedist who told him he would need a large reconstruction of the cervical spine to address the problems he had been experiencing.  Mr. McElligott, you have informed me that Mr. Almonte elected to proceed with surgery at that visit and expressed his decision to his BOP providers at the earliest opportunity. I have assumed this to be true in formulating my opinions despite notation in the surgeon's consult note where he documents "patient is going to consider his options".

For approximately a year and a half, medical providers and administrators at FCI-Danbury took no apparent action to ensure that Mr. Almonte received the surgery he needed.  You have informed me that throughout the period from late 2018 until his eventual release from FCI-Danbury, Mr. Almonte repeatedly made verbal inquiries and complaints about the scheduling of his surgery to FCI-Danbury administrative staff.  You also informed me that Mr. Almonte spoke with medical trip coordinator Mr. Stauber on two or three occasions to follow up about when the surgery would be scheduled.  Stauber also told him that the surgery was scheduled and that he should be patient. Evidently, however, it was not.  This action by Mr. Stauber fell below the standard of care.

On January 7, 2019, Mr. Almone had another sick call with Dr. Greene in which Dr. Greene notes that "decompression at the C4-5 level is needed- per recommendation of orthopedics." Again, the surgery was not scheduled. On February 15, 2019, Mr. Almonte had another MRI of his lumbar (lower) spine, which showed additional severe spinal stenosis at the L4-L5 levels.  On April 17, 2019, Mr. Almonte had a visit with BOP medical provider Dr. Julie Fabregas-Schindler, to whom he reported that he was experiencing pain in his lower back and radiating down his left leg, aggravated by walking and standing, which he rated as a 10 out of 10 in severity.  On May 22, 2019, Mr. Almonte told Dr. Fabregas-Schindler, in sum and substance, "I feel like I am going to fall over when I walk, especially in the morning."  For both of these encounters, Dr. Fabregas-Schindler does not address the severely abnormal MRI showing ongoing compression of the spinal

cord and nerves. Rather, she doesn't even seem to be aware that the patient had had an MRI as she concentrates instead on the hip and sacroiliac joints, performs manipulation techniques, tells him to avoid playing sports and offers reassurance that he will be okay. This unfamiliarity of Mr. Almonte's lengthy past medical history, severely abnormal CT scan and now very concerning MRI falls below the standard of care.

On June 10, 2019, Dr. Fabregas-Schindler ordered an urgent neurosurgery consultation for Mr. Almonte for both his cervical and lumbar stenosis. The same day, however, Dr. Fabregas-Schindler cancelled the referral for reasons not documented in the medical records.  This cancellation fell below the standard of care.

During a follow up visit, Dr. Fabregas-Schindler makes no reference or asks how he is doing regarding his neck/back pain and the arm issues.  Instead, she documents "No" under the Pain heading. This would have been an ideal time to check on the referral and find out that it had been canceled and was not pending an approval or appointment.  Her failure to follow up on the surgery status during the follow up visit fell below the standard of care.

On October 15, 2019, Mr. Almonte saw Dr. Fabregas-Schindler again and complained of inability to perform basic tasks because of his neck pain.  Dr. Fabregas-Schindler wrote that Mr. Almonte "was supposed to have cervical surgery, but the referral was cancelled. It is not clear as to why he never saw specialist." At this visit, Dr. Fabregas-Schindler does another round of manipulation and states follow up is "as needed".  In light of the previous delay in trying to surgically address Mr. Almonte's serious spinal cord conditions, and order for follow up "as needed" fell below the standard of care.  On November 1, 2019, Dr. Fabregas-Schindler generated yet another urgent neurosurgery referral for Mr. Almonte.  Ultimately, however, Mr. Almonte was released and arranged for the needed surgery himself in the community.

As discussed above, my opinion is that there appears to be evidence of medical negligence on the part of Dr. Robert Greene, Dr. Julie Fabregas-Schindler, Helen MacGregor, Shirley Nati and Jeremy Stauber.  I hold these opinions to a reasonable degree of medical probability.  These opinions may be supplemented or amended based on my review of additional materials. Additional review may or may not affect my present opinions.

**REDACTED**

_____